PLAINTIFF'S
EXHIBIT

2
_____

1

```
1              IN THE UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4       JESSICA ROSA,

5              Plaintiff,

6       Vs.                    2:24-CV-00013

7       AUBURN UNIVERSITY

8       MONTGOMERY and

9       AUBURN UNIVERSITY,

10             Defendants.

11

12             DEPOSITION OF SCOTT PARSONS

13                  OCTOBER 18, 2024

14

15                    STIPULATION

16             IT IS STIPULATED AND AGREED, by and

17      between the parties through their respective

18      counsel, that the deposition of SCOTT

19      PARSONS, taken before Susan Masters Goldman,

20      Alabama Certified Court Reporter, License

21      Number 83, and Notary Public, via Zoom on the

22      18th day of October, 2024 at or about 9:00

23      a.m.
```

⬆

2

```
 1              IT IS FURTHER STIPULATED AND AGREED
 2      that the signature to and the reading of the
 3      deposition by the witness is waived, the
 4      deposition to have the same force and effect
 5      as if full compliance had been had with all
 6      laws and rules of Court relating to the
 7      taking of deposition.
 8              IT IS FURTHER STIPULATED AND AGREED
 9      that it shall not be necessary for any
10      objections to be made by counsel as to any
11      questions, except as to form or leading
12      questions, and that counsel for the parties
13      may make objections and assign grounds at the
14      time of the trial, or at the time said
15      deposition is offered in evidence, or prior
16      thereto.
17              IT IS FURTHER STIPULATED AND AGREED
18      that notice of the filing of the deposition
19      by the Commissioner is waived.
20
21
22
23
```

3

```
1                           INDEX
2    EXAMINATION BY                    PAGE NO.
3    Ms. Gill                          5
4
5                         EXHIBITS
6              (No exhibits marked)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

4

```
 1                     APPEARANCES

 2     BEFORE:

 3          Susan Masters Goldman, Alabama Certified

 4          Court Reporter, License Number 83, and

 5          Notary Public.

 6     APPEARING ON BEHALF OF THE PLAINTIFF:

 7          Patricia A. Gill, Esq.

 8          Barrett & Farahany

 9          2 20th Street North, Suite 900

10          Birmingham, Alabama 35203

11     APPEARING OF BEHALF OF THE DEFENDANTS:

12          Douglas Kauffman, Esq.

13          Ames Filippin, Esq.

14          Balch & Bingham, LLP

15          Post Office Box 306

16          Birmingham, Alabama 35202

17

18     ALSO PRESENT: Jessica Rosa

19

20

21

22

23
```

1           I, Susan Masters Goldman, Alabama

2       Certified Court Reporter, License Number 83,

3       acting as Notary Public, certify that on this

4       date as provided by Rule 30 of the Alabama

5       Rules of Civil Procedure, and the foregoing

6       stipulations of counsel, there came before me

7       via Zoom on the 18th day of October, 2024 at

8       or about 9:00 a.m., SCOTT PARSONS, witness in

9       the above cause, for oral examination,

10      whereupon, the following proceedings were

11      had:

12

13                  SCOTT PARSONS,

14      after having been first duly sworn, testified

15      as follows:

16

17          THE REPORTER:  Usual stipulations?

18          MS. GILL:  Yes.

19          MR. KAUFFMAN:  Yes.

20      EXAMINATION BY MS. GILL:

21          Q.  Mr. Parsons, if you could, please state

22      your name for the record.

23          A.  It's Scott Wilson Parsons.

1        Q.   And, Mr. Parsons, where do you work?

2        A.   Right now, I work Western New England

3   University.

4        Q.   Western where?

5        A.   Western New England.

6        Q.   New England.  Okay.

7        A.   I'm employed through an interim

8   placement firm.

9        Q.   Mr. Parsons, have you ever given a

10  deposition before?

11       A.   I have not.

12       Q.   Okay.  I'll just give you a few ground

13  rules.  If you can say yes or no out loud for

14  the court reporter.  It's hard for us to read

15  a transcript that says uh-huh or huh-uh.  Is

16  that fair?

17       A.   Yes.

18       Q.   Okay.  Sometimes in depositions we ask

19  bad questions because we've got a lot going

20  on in our head.  So if you don't understand

21  something I'm asking, if you could please ask

22  me to rephrase it or let me know that you

23  don't understand, it's really important that

1    we are on the same page:  Is that fair?

2        A.  Yes.

3        Q.  If you don't ask me to rephrase it, I'm

4    going to assume that you do understand my

5    question; is that fair?

6        A.  Yes.

7        Q.  Okay.  Are you on any drugs or

8    medication that would alter your memory or

9    your ability to answer my questions today?

10        A.  I am not.

11        Q.  Okay.  Do you have any relatives in the

12   Montgomery area?

13        A.  I do not.

14        Q.  Were you a member of any civic

15   organizations in the Montgomery area?

16        A.  Not that I recall, no.

17        Q.  I notice that you are answering a

18   cellphone or something.  If you could put

19   that away during the deposition, I would

20   appreciate that.

21        A.  I'm not answering the cellphone.

22        Q.  It looked like you were looking down.

23        A.  I'm making a note.

8

```
1          Q.  Oh, okay.  I'm sorry.

2              Mr. Parsons, how long have you been at

3     New England University?

4          A.  I started here on July 15th.

5          Q.  Of this year?

6          A.  Yes.

7          Q.  Okay.  And where were you prior to

8     that?

9          A.  I retired from Auburn University in

10    Montgomery on May 1st, I believe.

11         Q.  Of 2024?

12         A.  Correct.

13         Q.  You said you retired.  Was this

14    something you had given notice for or was it

15    involuntary retirement?

16         A.  I gave notice.

17         Q.  Had you accepted another position

18    already before you retired?

19         A.  No.  I had just reached my twenty-five

20    years of service and was retiring.

21         Q.  Okay.  Mr. Parsons, what was your

22    position at AUM?

23         A.  The vice-Chancellor for Financial and
```

1    Administrative Services and I served as the

2    University's CFO.

3        Q.  And was your office located on the

4    ninth floor?

5        A.  Yes.

6        Q.  Were you near the office of Leslie

7    Meadows?

8        A.  Yes, we were on the same floor.

9        Q.  And did you supervise Leslie Meadows?

10       A.  Yes, I did.  She also had a dotted line

11   to Dr. Stockton.

12       Q.  What do you mean by dotted line, he was

13   her supervisor as well?

14       A.  That's correct.  It was a dual report.

15       Q.  Do you have any degrees?

16       A.  Yes.  I have an undergraduate degree in

17   accounting and a Master's in accounting, and

18   both are from Auburn University.

19       Q.  Undergraduate and Master's?

20       A.  Correct, yes.

21       Q.  What year did you get your undergrad?

22       A.  I believe it was '98 and then '99 for

23   the Master's.

1    Q.  How long were you University CFO at

2    AUM?

3    A.  Since 2017.  I started on February 1st,

4    I believe.  It was either February 1st or

5    March 1st of 2017.

6    Q.  Okay.  Where did you work before that?

7    A.  I worked for Auburn University on the

8    main campus for the College of Agriculture

9    and the Ag Experiment section.

10    Q.  Okay.  And how long were you in that

11    position?

12    A.  I started my career there in December

13    of 2000 and I started in the Academic

14    Department and moved my way up.  I worked for

15    Agriculture until I left in, you know,

16    February or March of 2017.

17    Q.  After you graduated and got your

18    Master's, you went straight to work for

19    Auburn?

20    A.  Yes.

21    Q.  So you have basically been at Auburn

22    until 1998 until this year?

23    A.  Correct.

1          Q.  At Auburn from 1998 until when?

2          A.  Well, I worked for Auburn in a

3     full-time capacity since December of 2000

4     until February or March of 2024.

5          Q.  Okay.

6          A.  Prior to that, I was a graduate student

7     and went to school there.

8          Q.  Okay.  Got it.

9              Do you have any other degrees or

10    certifications that you haven't told me

11    about?

12         A.  I do not.

13         Q.  When you lived in the Montgomery area,

14    were you a member of any extracurricular

15    clubs or activities?

16         A.  I was not or at least nothing that

17    comes to mind.  I wasn't very active in the

18    community.

19         Q.  So all of your connections would be

20    through AUM or Auburn?

21         A.  Yes, by and large.

22         Q.  Were you a member of any country club

23    or golf courses?

```
 1          A.  Well, I was a member at Robert Trent

 2     Jones maybe the first year I was there.  It

 3     was a public membership, it's not a private

 4     course.

 5          Q.  Do you play golf with Dr. Stockton?

 6          A.  I do -- or I have.

 7          Q.  I guess you don't anymore since you are

 8     up north.  But before when you worked there

 9     did you play golf with the new athletic

10     director, Mr. Maas?

11          A.  I've played with him, yes.

12          Q.  How often do you think you've played

13     with Dr. Stockton or Mr. Maas?

14          A.  I really haven't been playing much

15     golf.  It was mainly whenever we had

16     fundraiser.  We would participate in some of

17     the community tournaments, and that's when we

18     would play golf.  It was kind of through the

19     University, so there might be a Chamber event

20     or a Child Protect or something like that.  I

21     haven't played -- other than my first year or

22     two, I really haven't played much just

23     recreational golf.
```

1      Q.  Did y'all go practice before the

2   tournaments?

3      A.  No, or at least not that I recall.  We

4   would hit balls on the range, you know, prior

5   to the tournament like thirty minutes early.

6      Q.  Did you ever attend any Auburn football

7   games with either Dr. Stockton or Mr. Maas?

8      A.  I went to an Auburn football game when

9   I first started working at Auburn -- I mean,

10  at AUM.  Sorry.

11      Q.  Was that an A-Day game?

12      A.  It wasn't.

13      Q.  Did you attend an A-Day game?

14      A.  I did not.  I've never been to one.

15      Q.  What is your stance about gay people?

16      A.  My stance about gay people?

17      Q.  What is your opinion of gay people?

18      A.  I'm supportive of it.  My daughter is

19  gay.

20      Q.  When did she come out?

21      A.  I'm not really sure.

22      Q.  Did she come out during the timeframe

23  that Jessie Rosa was Athletic Director?

```
 1        A.  Maybe.  It was while I was at AUM.

 2        Q.  How did you feel when she came out?

 3        A.  I was fine.  She called and said she

 4   needed to talk to me about something and told

 5   me, you know, that she was gay.

 6        Q.  Were you concerned when she first came

 7   out?

 8        A.  No.

 9        Q.  You weren't concerned for her future?

10        A.  No.

11        Q.  You weren't concerned how she would be

12   perceived in the community?

13        A.  No.  She was happier than I had ever

14   seen her, so I was happy about it.

15        Q.  Are you okay with gay marriages?

16        A.  Yes.

17        Q.  Okay.  Do you have any opinions on

18   whether gay people have a choice to be gay or

19   whether they just are gay?

20        A.  I don't have any opinions on it.

21        Q.  Does your daughter have a partner?

22        A.  She does.

23        Q.  Is she married?
```

1        A.  She is not.

2        Q.  Do you have any opinions about gay

3    marriage?

4        A.  I don't.  If she wants to get married,

5    I would be supportive.

6        Q.  Do you attend events and social

7    activities with your daughter and her

8    partner?

9        A.  I do.  They live in Portland, Oregon,

10   so I fly out there on occasion to visit.

11       Q.  They live in Portland?

12       A.  Yes.

13       Q.  And you didn't have any struggles or

14   problems when she first came out?

15       A.  No, I did not.

16       Q.  Does AUM have any morals clauses or

17   other policies that prohibit gay

18   relationships?

19       A.  Not that I'm aware of, no.

20       Q.  Did you ever tell I think Tobias that

21   you didn't think Jessie Rosa should be

22   Athletic Director because she was too young,

23   female, and gay?

1          A.  I did not say that.

2          Q.  Do you have any opinions about women

3     and where they belong in society?

4          A.  Just to kind of get to the nature of

5     your question here, I just don't see any

6     difference between anyone based on their

7     orientation, their sex or any of that.

8          Q.  Why would Tobias tell my client, Ms.

9     Rosa, that you said that if you didn't?

10         A.  I can't speak to what his motivations

11    would be.  It would be a good question to ask

12    him.

13         Q.  Is Tobias an honest person?

14         A.  I don't know if he is or he isn't.

15         Q.  Do you think Jessie Rosa is an honest

16    person?

17         A.  I don't know if she is or isn't.

18         Q.  Do you remember when Amber Rae Childers

19    took over sport oversight?

20         A.  What do you mean when she took over

21    sport oversight?

22         Q.  Well, let me ask you this:  My

23    understanding is at some point Ms. Amber Rae

```
1    Childers took over the sport oversight of the
2    two soccer teams, the male and the female
3    soccer teams.  Were you aware that that
4    happened?
5        A.  I wasn't aware that it happened.
6        Q.  Okay.  Are you aware of that today?  Am
7    I breaking the news to you?
8        A.  I'm really not.  You know, there may
9    have been some discussion of that at some
10   point, but the day-to-day operation, the
11   structure of Athletics, isn't something that
12   I was really involved in.
13       Q.  When you say some discussions of that,
14   what were the discussions you may have had?
15       A.  So it could have come up when, and
16   that's I was asking, I believe she became
17   interim Athletic Director after Jessie left
18   if I remember all of that right.  I just
19   don't know.
20       Q.  Were you aware that she took over
21   oversight before Jessie left?
22       A.  No, I was not.
23       Q.  Was that a topic of the issue
```

✦

1    surrounding Ms. Rosa's termination?

2        A.  It's not a topic that was brought to

3    me.

4        Q.  Okay.  Were you involved in any

5    conversations surrounding Ms. Rosa's

6    termination?

7        A.  So, you know, kind of the long and

8    short of that would be that, you know, I just

9    was basically informed that, you know, there

10   was an employee issue involving Jessie Rosa,

11   and that was about the extent of it because

12   HR reported to me.  So they were working

13   through that, but I wasn't -- I wasn't

14   sitting in meetings and discussing the

15   details of it as that evolved.

16       Q.  Who in HR reported it to you?

17       A.  Leslie Meadows.  It was not uncommon

18   for her to do that.

19       Q.  Sure.  And what did she say when she

20   reported it to you?

21       A.  I don't recall the details of it or the

22   specifics.

23       Q.  All you know is that there was an

1    employee issue?

2        A.   Yes.   I mean, she would said something

3    of the nature of, hey, we have an employee

4    issue, it relates to Jessie, and we're

5    working through it.   They were very quiet

6    about it.   And really what HR typically does

7    for me is they would say in a lot of cases,

8    hey, there is an employee issue, I just want

9    you to know where that resides and then they

10   would start working with Auburn's general

11   counsel on it if it was of any magnitude.   I

12   mean, if it was something like somebody

13   showing up late for work, they would tell me

14   that.

15       Q.   You mentioned that they were very quiet

16   about it.   There has been some testimony in

17   this case that people at the University of

18   Montevallo heard what happened, and my client

19   didn't tell anybody.   How would they have

20   found out about this?

21           MR. KAUFFMAN:   Object to the form.

22           You can answer, Scott.

23           MS. GILL:   He is preserving the record

⬆

1    for later.

2        A.  I wouldn't know how people at

3    Montevallo would know about it.

4        Q.  (BY MS. GILL) There also has been some

5    testimony in this case that there is a lot of

6    gossip and there are no secrets on the ninth

7    floor.  Do you dispute that testimony?

8        A.  I can't speak to whether people gossip

9    or not.

10        Q.  Did you participate in gossip on the

11    ninth floor?

12        A.  I don't have an interest in it.

13        Q.  Do you have an opinion of Jessie Rosa?

14        A.  I don't.

15        Q.  Did you think she was a good Athletic

16    Director?

17        A.  I just don't really have an opinion on

18    it.  She didn't report to me.  You know, we

19    worked together professionally, we would see

20    each other at athletic events.  The athletic

21    programs, you know, did fine while she the

22    Athletic Director.  I can't speak to what she

23    did day to day and all of that because she

1    didn't report to me.

2        Q.  Other than the issue that we are here

3    about today, the reporting of a consensual

4    relationship, did you have any reports of

5    poor performance or poor leadership skills as

6    it relates to Jessie Rosa prior to that?

7        A.  Not that I recall, nothing to note.  I

8    wouldn't necessarily hear about them either.

9        Q.  When Leslie Meadows told you she had an

10   employee issue, did she say it was an

11   employee had disclosed a consensual

12   relationship and we're trying to figure out

13   how to manage it?

14       MR. KAUFFMAN:  Object to form.

15       When I object, you can still answer.

16       A.  I don't remember, you know, exactly

17   what Leslie told me, you know, when she first

18   approached me about it.

19       Q.  (BY MS. GILL) You don't remember the

20   conversation at all?

21       A.  I really don't.

22       Q.  If Leslie testified that you responded

23   with shock and disbelief, do you dispute her

1    testimony?

2         A.  I don't know that I would characterize

3    that it way.

4         Q.  Did you know that she had disclosed a

5    consensual relationship?

6         A.  I mean, at some point during all of

7    this, I did.  I couldn't tell you at what

8    point.

9         Q.  Did you form an opinion on whether or

10   not it could be managed?

11        A.  I did not.

12        Q.  Did you advise anyone that you felt it

13   could not be managed?

14        A.  I did not.

15        Q.  Did Leslie Meadows seek guidance from

16   you on whether or not it could be managed?

17        A.  She did not, at least not that I

18   recall.

19        Q.  Did you have any conversations with

20   Jessie Rosa about it?

21        A.  No.  I don't think I had any

22   communication with Jessie as soon as all of

23   that started.  I could be wrong about that,

1    but I believe that's correct.

2        Q.  Never spoke directly to Jessie when

3    they were trying to figure out a plan or

4    about her termination or after?

5        A.  No, I don't believe so.

6        Q.  So the one conversation where Leslie

7    informed you that we're having an employee

8    problem that you don't really remember the

9    details of, did you have any other

10   conversations with her?

11       A.  No, none that I recall.  I mean, we

12   would talk, you know, on a daily basis.

13       Q.  I meant about this issue.  I'm sorry.

14       A.  I didn't have much detail on it at all

15   even to this day.  I haven't seen files.

16       Q.  Did you advise anyone, Dr. Stockton,

17   Leslie Meadows, Robert Gottesman, anyone that

18   it could be not be managed and Ms. Rosa

19   should be terminated?

20       A.  I did not.

21       Q.  Did you talk to Robert Gottesman when

22   this was happening?

23       A.  I did not.

✦

24

```
1        Q.  Do you know who Robert Gottesman is?

2        A.  I do know who Robert Gottesman is.

3        Q.  Do you Kristin Roberts?

4        A.  I do.

5        Q.  Did you talk to her?

6        A.  I have, but not about this matter.

7        Q.  And that's what I meant.  Thank you.

8            Did you talk to Julianna Herrity?

9        A.  No.  I don't know that I have ever

10   spoken with the coach.  I could be wrong, but

11   I'm not sure that I have.

12       Q.  You said you're the CFO so you are in

13   charge of financial decisions?

14       A.  That's correct.  I was in charge of the

15   financial management of the University, not

16   necessarily all financial decisions.

17       Q.  Did anyone some to you and ask you

18   whether or not having co-athletic directors

19   would have been financially feasible?

20           For example, if Ms. Rosa had stepped

21   her salary down and would have had Ms.

22   Childers' salary stepped up, did anybody

23   discuss that with you?  Is that a no?
```

1        A.  Yes, no, nobody discussed it with me.

2        Q.  Okay.  All right.  So that would be

3    something that they would want to with you

4    because you were over the financial; right?

5        A.  It would depend, you know, just on what

6    the approach on that was.  It could be just

7    an Athletic budget decision that reports up

8    to Dr. Stockton, so it might be something to

9    look at through that lens just the way we

10   budgeted.  It wouldn't be unusual for

11   somebody to ask me that, too, it

12   just depends.

13       Q.  Would Dr. Stockton have to come to you

14   for permission to do something like that or

15   could he have approved that?

16       A.  He wouldn't have to come to me.  He

17   would discuss it with me more than likely,

18   but he's the Chancellor of the university.

19       Q.  Right.  There has been some testimony

20   in this case that there was some one-on-one

21   with all the coaches after Ms. Rosa left and

22   they were all asked what their departments'

23   needs are, and a lot of the coaches received

26

1    a pay bump.  Were you involved in that

2    decision?

3         MR. KAUFFMAN:  Object to the form.

4         You can answer, Scott.

5     A.  I wasn't involved in individual

6    decisions to increase pay for coaches.

7     Q.  (BY MS. GILL) Were you involved in the

8    decision to give one of the coaches a full

9    expense-free trip to Italy for recruiting?

10        MR. KAUFFMAN:  Object to form.

11        You can answer.

12    A.  I was not.

13    Q.  (BY MS. GILL) Were you aware that

14   Julianna Herrity was not approached and asked

15   what she needed for her soccer team?

16        MR. KAUFFMAN:  Object to form.

17    A.  I was not.

18    Q.  (BY MS. GILL) There's been some

19   testimony in this case about different

20   meetings that occurred with Ms. Rosa.  Were

21   you kept informed as the events were

22   happening?

23    A.  Not beyond maybe there was a meeting,

```
 1    you know, so that somebody wouldn't be

 2    available whether it be Leslie or Dr.

 3    Stockton.  This consumed a lot of their time.

 4    So at times, I would just be told, hey, we

 5    are not going to be available today or, you

 6    know, we're not available this afternoon or

 7    whatever it might be.

 8        Q.  It consumed a lot of their time?

 9        A.  Yes.

10        Q.  How did you know that, just them saying

11    they can't meet up for whatever reason?

12        A.  Like you referenced earlier, Leslie was

13    on my floor.  I had a lot of regular

14    intersection with Leslie and Dr. Stockton.

15    So, you know, they were in meetings a lot

16    together because they were working with, you

17    know, Auburn and working through this.

18        Q.  So did you know --

19        A.  I would assume it was related to this.

20        Q.  Did you know what the subject matter

21    was?

22        A.  I mean, I wouldn't definitely know, but

23    it was an assumption that I made.
```

↑

1      Q.  Did you know when she said we have an

2    employment issue that it did involve Jessie

3    Rosa and Julianna Herrity?

4      A.  Again, I don't recall the specifics.  I

5    know she would have said Jessie who was over

6    in Athletics.  It probably was something in

7    the nature of, hey, we have an employee issue

8    in Athletics, it involves Jessie and we are

9    working on it, something to that effect.

10      Q.  Do you remember or have any information

11    about the management plan issued to Chasen

12    and Scottie in the Athletic Department?

13      A.  I know that there was a discussion

14    about it.  Whether or not there was one in

15    place or one was put in place, I can't speak

16    to that.

17      Q.  Were you aware that they never

18    disclosed?

19        MR. KAUFFMAN:  Object to the form.

20      A.  I don't understand the question.

21      Q.  (BY MS. GILL) Under the Consensual

22    Relationship Policy, people need to

23    self-disclose and then tell them we need a

1      management plan.  Are you aware that they did

2      not do that?

3          A.  I'm not aware of that.

4          Q.  And somebody in HR said, hey, I think

5      these two are in a relationship; do you

6      remember that?

7          A.  I do remember that.

8          Q.  Okay.  At that point after they were

9      outed for having a relationship, y'all

10     entered into a consensual management plan; do

11     you remember that?

12         MR. KAUFFMAN:  Object to form.

13         A.  I don't remember it as it relates to

14     the plan because -- I don't remember what

15     they did with regard to that because the

16     employee was in a different group and worked

17     in grounds and the coach was over in

18     athletics.  They were in two different areas.

19         Q.  (BY MS. GILL) You're saying there

20     wasn't a conflict?

21         A.  No.  I'm just saying they were in two

22     different areas.

23         Q.  Did y'all drop the whole issue about

1    the consensual management plan the day after

2    Anthony Rosa was fired?

3       A.  I don't recall.

4       MR. KAUFFMAN:  Trish, I'm going to

5    remind you we are not answering questions

6    about Anthony Rosa today.

7       MS. GILL:  That's all I'm asking.  It's

8    really about their management plan, not

9    really about Anthony.

10       MR. KAUFFMAN:  Understood.

11       MS. GILL:  If we want to take a second,

12    I'm going to talk to complaint real quick.

13       MR. KAUFFMAN:  Sure, of course.

14       Q.  (BY MS. GILL) I just have couple more

15    questions.

16       A.  Sure.

17       Q.  Do you remember an incident that

18    occurred at AUM involving the Athletics

19    Department, a student had accused Amber Rae

20    Childers of being racist because she told her

21    to put a mask on; do you remember that

22    incident?

23       A.  I have some memory of that.

1        Q.  Did you participate in that

2    investigation?

3        A.  No.

4        Q.  Did you sit in on any meetings?

5        A.  I don't remember.  I could have.

6        Q.  If Ms. Rosa says you did, do you

7    dispute that?

8        A.  Like I said, I just don't remember.

9        Q.  Why would you sit in if you don't get

10   involved in the investigation?

11       A.  If I sat in on meeting regarding it and

12   I'm not saying I sat in on an investigation,

13   but I may have sat in on a meeting, I just

14   don't know.

15       Q.  Okay.  So you may not get involved in

16   the actual investigative process, but you

17   might sit in on meetings relating to the

18   issues involving the Athletic Department; is

19   that what I'm hearing you say?

20       A.  Well, I mean -- I'm a member of the

21   senior staff, Jessie was a member of the

22   senior staff when on she was on staff, so

23   things might have been discussed at some

1    level.

2        Q.  Did you sit in on any meetings as it

3    relates to the termination of Jessie Rosa?

4        A.  No, I did not.

5        Q.  What about an incident where a coach

6    was accused of assaulting a student athlete;

7    do you remember that?

8        A.  Actually, I don't remember that.

9        Q.  Okay.  Did Leslie Meadows talk to you

10   about the fact that Ms. Rosa had asked about

11   the difference in treatment of Bruce Pearl?

12       A.  I don't remember having a discussion

13   about that.

14       Q.  She didn't say Ms. Rosa had brought up

15   Bruce Pearl and his son and asked how they

16   managed their plan?

17       A.  I don't recall that.

18       Q.  You don't recall that.

19           MS. GILL:  I think that's all I have

20   got.  Let me confirm?

21           We are finished.  Thank you.

22       A.  Thank you.

23           FURTHER DEPONENT SAITH NOT

1               C E R T I F I C A T E

2

3          I, SUSAN MASTERS GOLDMAN, certified

4    Court Reporter, License Number 83, and Notary

5    Public, hereby certify that the above and

6    foregoing deposition was taken down by me on

7    Computerized Stenotype, and the questions and

8    answers thereto were transcribed by me, and

9    that the foregoing represents a true and

10   correct transcript of the deposition given by

11   said witness upon said hearing.

12          I further certify that I am neither

13   attorney or counsel for, nor related to or

14   employed by any of the parties to the action

15   in which this deposition is taken.

16

17                   <%18338,Signature%>
18                   Susan Masters Goldman

19                   CCR #83, Expires 09/30/25

20                   Commissioner for the

21                   State of Alabama at Large

22                   My Commission Expires: 08/30/26

23